UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TERRELL WILLIAMS,                                        **DECISION AND ORDER**

                 Petitioner,                          No. 02-CV-0756

      -vs-

WILLIAM PHILLIPS, Superintendent,

                 Respondent.

_____

## INTRODUCTION

Petitioner, Terrell Williams ("Williams"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on one count of second degree murder. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Robert Holmes ("Holmes" or "the victim") was fatally shot by several men, execution-style, four times on the night of June 10, 1997. At the time he was shot, he had been standing in front of a convenience store on the corner of Portland Avenue and Aebersold Street in the City of Rochester. Various witnesses, including the other perpetrators, gave statements to the police linking Williams to the shooting, and Williams was arrested and charged with second degree (intentional) murder. He gave a statement to the police admitting that he had been involved in the shooting, but denying that he was the trigger-man.

Williams was tried before a jury in New York State Supreme Court (Monroe County) (Cornelius, J.). The prosecution introduced into evidence Williams's written, signed statement to

the police in which he claimed that a drug dealer had hired him and several of his friends ("Calvin", "Larry", and "LaSharm") to shoot someone known as "Raw Dog" (Holmes). Although the drug dealer only wanted Raw Dog shot in the legs, that was not how Williams and his group operated; according to Williams, they only shot to kill. Williams claimed that Larry shot the victim four to five times at point blank range with a 9-mm pistol. Williams stated that LaSharm had a .45-caliber Glock pistol and that he also shot Raw Dog "several times." Williams denied that he was carrying a gun that night prior to the shooting. Williams told the police that the was only the "gun runner" whose job it was to "take the gun and get rid of it after it was done." Williams said that everyone called him "the runner" because he was "quick on [his] feet."

After Raw Dog was shot, Williams and the other perpetrators ran over to Williams's mother's house at 87 Miller Street. Once they arrived, a man Williams knew named Ronald Loving ("Loving") handed the keys to a black truck to a person whom Williams knew as "Panama." Williams said that Loving told "Panama" (*i.e.*, Raul Morrell) to drive them around and drop them off somewhere. Later that night, Williams went over to the home of Carol Glenn ("Glenn") house, the girlfriend of his brother. Williams related that he changed out of his clothes and Glenn gave him a pair of green Nautica-brand shorts to wear. Williams told the police that he was "pissed" that he never received the $350 or $400 he was supposed to have been paid for his part in the murder.

Glenn identified Williams's picture in a photographic array and testified at trial that she had been at 87 Miller Street at the time of the shooting. She heard gunshots and shortly thereafter, three man ran up to the house. Glenn recalled that Williams was wearing all black and

was holding a gun. T.386-88.[1] Glenn testified that she heard Williams say something to the effect of, "[S]omebody started reaching for they [*sic*] gun and so he [Williams] reached for his and he shot." T.388. Glenn said that later that night, Williams came over to her apartment and changed his clothes. T.391. A couple of days later, Glenn saw Williams, and he threatened to harm her children if she did not stop talking to the police. T.394 ("It [was] like if I keep running my mouth to the cops, I be [*sic*] less of one child.").

Loving, who was familiar with Williams, also identified William's picture in a photographic array. Loving told the police that shortly after the murder, Williams asked him to provide a truck to use in order to flee the area. Morell, who confirmed that his nickname was "Panama," had known Williams and his mother for about six years prior to the incident. He identified Williams after being shown a photographic array. At trial, Morell testified that he heard gunshots shortly after midnight coming from the direction of the store on Portland and Aebersold.  He soon saw Williams and several other men by the driveway at the side of 87 Miller Street. T.342. Morell said Williams, whom he knew as "Pep," and another man were holding  guns. T.344. Morrell recalled that Williams was wearing a black "hoody." T.361.

Robert Tisdale ("Tisdale") testified that he had been inside the store on the corner of Portland Avenue and Aebersold Street shortly before midnight on June 10, 1997. Inside the store, he had seen two men arguing about money. One man, who was wearing a black hooded jacket, said that he needed the money "that night" from the other man, whom Tisdale identified as the victim. Tisdale could not identify the man who was demanding money because the hooded jacket obscured his face. Tisdale then left and headed home; shortly thereafter, he heard several

---

[1]  Citations to "T.___" refer to the trial transcript.

gunshots coming from the vicinity of the store. Tisdale saw three men run past his house; one man was "laughing about [how] he shot him." T.329-38. Kassem Saleh ("Saleh") testified that he heard five shots and saw three people and the victim at the crime scene. He saw one person with a gun in his hand doing the shooting.

The medical examiner testified that the victim had sustained four gunshot wounds caused by bullets from two weapons of different calibers. T.558-78. Eight shell casings were recovered at the crime scene in front of the store, and a total of eight bullets were recovered from the victim, the doorway of the store, and at the left side of the store.

The defense called one witness who testified that there was only one shooter, and that he shot twice. T.641-62. Williams did not testify at trial.

The jury returned a verdict convicting Williams of second degree murder as charged in the indictment. He was sentenced to an indeterminate term of imprisonment of twenty-five years to life.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on May 2, 2001. The New York Court of Appeals denied leave to appeal on August 14, 2001.

Williams filed his habeas petition on October 17, 2002. *See* Docket #1. On January 24, 2003, after respondent had answered the petition, Williams filed a motion to have his petition held in abeyance so that he might return to state court and exhaust claims regarding the trial court's alleged denial of a *Wade* hearing and a *Rodriguez* hearing to challenge the pre-trial identification procedures. The Court (Foschio, M.J.) provisionally granted the stay on the condition that Williams file an amended petition setting forth his proposed claims. On March 30,

2004, Williams filed an amended petition, *see* Docket #16, and the stay was granted, *nunc pro tunc*. Respondent filed a supplemental response to Williams's amended petition. *See* Docket #19. Williams submitted a traverse in reply to respondent's supplemental pleadings. *See* Docket #23.

The case subsequently was transferred to the undersigned. *See* Docket #26. It appears that the matter is now fully briefed and ready for decision. For the reasons set forth below, the petition is denied.

## DISCUSSION

**Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Analysis of Claims Presented in the Petition**

**1.     Failure to hold *Rodriguez* and *Wade* hearings**

Williams alleges that the trial court erroneously failed to hold hearings pursuant to *People v. Rodriguez*, 79 N.Y.2d 445, 583 N.Y.S.2d 814 (N.Y. 1992), and *United States v. Wade*, 388 U.S. 218, 228 (1967), in order to determine the reliability and admissibility of the witness identifications of Williams. (This is the claim for which Williams sought a stay of his habeas petition.) When Williams returned to state court to exhaust this claim by means of a motion

pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in 2004, the motion court denied the application, pointing out that the trial court in fact did conduct a *Wade* hearing on February 10, 1998. During that hearing the trial court heard testimony concerning the prior relationship between Williams and Raul Morrell and Ronald Loving, both of whom had identified Williams in a photographic array. The trial court concluded that both Morrell and Loving "had previously known the defendant," which made their identifications merely confirmatory. *See* Respondent's Supplemental Appendix ("Supp. App.") T at 77, attached to Docket #19. The motion court also denied Williams's C.P.L. § 440.10 application on procedural grounds–namely, because there were sufficient facts permitting Williams to have raised the issue on direct appeal, dismissal of the C.P.L. § 440.10 motion was mandated. Supp. App. E at 55-57 (citing N.Y. Crim. Proc. Law § 440.10(2)(c) (providing that the court *must* also deny claims that were unjustifiably not raised, but could have been raised on direct appeal)).

Respondent argues that the state court's reliance on a state procedural bar rule is an adequate and independent basis for denying petitioner's claim that the trial court failed to conduct *Rodriguez* and *Wade* hearings. A clear ruling based upon C.P.L. § 440.10(2)(c) is considered a procedural default which precludes consideration of the claim on federal habeas review unless the petitioner can show cause for default, and prejudice resulting from the alleged violation of federal law, or that a miscarriage of justice will occur if the claim is not considered. *See Arce v. Smith*, 889 F.2d 1271, 1273 (2d Cir. 1989) (citing *Wainwright v. Sykes*, 433 U.S. 72, (1977)); *see also Coleman v. Thompson*, 501 U.S. 722, 748, 750 (1991). A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "Innocence" means

"actual," as opposed to merely "legal," innocence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In order to prove actual innocence, the petitioner must have new, reliable evidence of either exculpatory scientific evidence; trustworthy eyewitness accounts; or critical physical evidence that was not presented at trial. *Id.*

Williams has not alleged the existence of cause or prejudice. Nor has he come forward with any new evidence, not presented at trial, that he is actually innocent of the crimes of which he was convicted. Consequently, Williams cannot overcome the procedural default, and his claims relating to the alleged denial of *Rodriguez* and *Wade* hearings cannot be heard on habeas review.

**2.    *Miranda* claim**

Williams contends that he was subjected to custodial interrogation without the benefit of *Miranda*[2] warnings. Both the trial court and Appellate Division found that Williams had not been "in custody" for the relevant time period.

At the suppression hearing, Investigator James Bentley testified that during the course of investigating Holmes's homicide, he ascertained that Williams was scheduled to meet with his probation officer on October 9, 1997. Because three of Williams's acquaintances had made confirmatory identifications indicating that Williams had been involved in the murder, Bentley arranged to have the probation officer detain Williams until Bentley arrived. Accompanied by an FBI agent, Bentley arrived at the probation office where they encountered Williams. At Bentley's request, Williams agreed to accompany them to the Rochester Police Department. Williams was transported, without restraints and as a front seat passenger, in a Ford Explorer

---

[2]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

driven by Bentley.

Upon their arrival, Williams was placed in an unlocked interview room located in a secure area of the police department. Between 11:10 a.m. and 1:08 p.m., Bentley, together with Sergeant John Gropp, engaged Williams in conversation about his family life, how his family problems had led to his involvement with drugs and weapons in the past, and his stint at a drug rehabilitation center. The police explained that they were investigating the murder of Holmes (a/k/a Raw Dog) and asked Williams if he had any knowledge of the incident. Williams initially stated that he had heard about the shooting the day after it happened, and that he had been selling drugs with his girlfriend, Keona Young, at 5 Eighth Street on the night of the shooting. The police testified that, during this portion of the interview, Williams was not challenged with regard to any statements he made to them. At the end of the interview, the officers asked if he knew which day of the week the shooting had taken place. Williams "emphatically" replied that he was "sure" that it would have been on a Thursday or Friday night. H.36.[3]  When the police mentioned the possibility that the homicide had occurred on a Tuesday night or Wednesday morning, Williams stated, according to Bentley, "You got me." Bentley recalled that Williams conceded that it was "possible" that he had been present at the beginning of the chain of events leading to the shooting. Gropp recalled that Williams stated, "You got me but I wasn't there." H.37.

This exchange took place at about 1:08 p.m. Bentley left the interview room and went over to the homicide department, where a decision was made to advise Williams of his *Miranda* rights since the interview was going to become more accusatory in nature based on the

---

[3]        Citations to "H.___" refer to the transcript of the suppression hearing.

statements Williams had just made. At about 1:15 p.m., Gropp and Detective D'Ambrosia read Williams the *Miranda* warnings off a pre-printed card. When asked whether he understood and would agree to waive his rights, Williams responded affirmatively by saying, "Yeah," to each question and nodding his head. The officers ascertained that Williams had a tenth-grade education and could read and write English.

Williams then was questioned for about fifty-eight minutes, until 2:41 p.m. Although the investigators accused him of being one of the perpetrators, Williams maintained that he had no involvement in the homicide. At about 1:43 p.m., D'Ambrosia left and Bentley returned to the interview room where he participated in questioning Williams.

Between 2:41 p.m. and 3:20 p.m., Williams agreed to undergo a voice-stress test which was administered by Investigator Kerr. At 3:30 p.m., Gropp and Bentley returned to the interview room and resumed their questioning of Williams. They falsely advised Williams of two things: that he had failed the voice-stress test and that there were eyewitnesses placing him at the scene of the crime. Nevertheless, Williams continued to maintain his innocence. Gropp and Bentley left the interview room at 4:11 p.m. Bentley returned with a photographer and had him take a picture of Williams because Williams was wearing shorts similar to ones described by a witness who had seen Williams on the day of the homicide.

At 4:45 p.m., Bentley returned to the interview room, accompanied by Sergeant Merklinger. Merklinger told Williams that he was in trouble, and he urged Williams to be honest with the police. Williams denied involvement for about five more minutes, and then he began to make admissions. In addition, Williams implicated two other individuals, whom he called "LaSharm" and "Larry." Bentley left at 5:11 p.m. and returned at 5:30 p.m. and reviewed

Williams's statement with him. After that, Williams was left alone for about an hour.

At 6:40 p.m., Bentley, Merklinger, and Investigator Sheridan re-entered the interview room and spoke to Williams. At 7:00 p.m., Sheridan left to go check the police records for the individuals named by Williams. At about 8:00 p.m., Bentley brought Williams to the homicide office and began to type up a written statement. This process was interrupted at 9:25 p.m., when Sheridan took Williams to another room in order to identify some photographs. After that, Williams returned to the homicide office, and his typewritten statement was completed. Williams reviewed the statement and signed it at 10:35 p.m.

The suppression court found that all of the statements made by Williams to members of the police department were "voluntary and not the product of any threats, promises or force." The fact that the police "did engage in some degree of deception . . . was not sufficient to render, as involuntary, the subsequent confession." Appendix ("App.") C. at 93-94 (citations omitted), attached to Docket #8. The suppression court found it significant that Williams continued to deny participation in the crime for "some period of time following these police statements." *Id.*

In determining that Williams was not "in custody" during the initial two-hour period that he spent talking to the police, the suppression court "placed primary emphasis" on the manner in which Williams was contacted by the police that day, how he was transported to the police station, and the "tenor of the discussion upon arrival[.]" App. C at 94.  The suppression court noted that it was only after Williams was read the *Miranda* warnings that "the questioning became accusatorial in nature." Thus, the court found, Williams was not in custody during that two-hour period, and *Miranda* concerns were not implicated at that time. *See id.* The subsequent confession, given after the *Miranda* warning, therefore was untainted by any constitutional error.

-10-

On direct appeal, the Appellate Division agreed that the suppression court

> properly determined that [defendant's] confession was not tainted by statements
> that defendant made to police before he was given *Miranda* warnings. Although
> defendant was questioned by police for approximately two hours before he was
> given *Miranda* warnings, that questioning was not custodial in nature. Defendant
> voluntarily accompanied police in an unmarked vehicle and sat in the front seat of
> the vehicle; he was not restrained in any way; he was left alone in an unlocked
> room for periods of time; the questioning was not accusatory in nature; and
> defendant did not at any time indicate that he did not want to speak to police or
> that he wanted to leave. During that initial period of questioning, statements made
> by defendant indicated to police that he was involved in the crime. He was then
> given *Miranda* warnings and waived his rights, but he did not admit his
> involvement in the crime until several hours later. Because the initial statements
> were not the product of pre-*Miranda* custodial interrogation, the post-*Miranda*
> detailed confession given by defendant cannot be considered the fruit of the
> poisonous tree[.]

*People v. Williams*, 283 A.D.2d 998, 999, 725 N.Y.S.2d 775 (App. Div. 4th Dept. 2001) (internal

citations and quotations omitted).

A habeas court is free to make an independent determination of whether an accused was

"in custody" since it involves a mixed question of law and fact. *See Thompson v. Keohane*, 516

U.S. 99, 109-10, 112-13 (1995) (holding that state court determinations of the "in custody"

requirement for *Miranda* purposes are not entitled to former 28 U.S.C. § 2254(d)'s (now §

2254(e)(1)) presumption of correctness). The Supreme Court held in *Miranda* that custodial

interrogation "'mean[t] questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way.'"

*California v. Beheler*, 463 U.S. 1121, 1123 (1983) (quoting *Miranda v. Arizona*, 384 U.S. at 444

(footnote omitted in original)); *see also Oregon v. Mathiason*, 429 U.S. 492 (1977)). Even if an

individual is "in custody," *Miranda* warnings are not required unless the police engage in

interrogation or its "functional equivalent," *i.e.*, "express questioning, [as well as] . . . any words

or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (footnote omitted). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quoting *Mathiason*, 429 U.S. at 495).

The facts in *Mathiason* are quite similar to the present case. There, the police initiated contact with respondent Mathiason through his parole officer. Respondent voluntarily agreed to come to the police department. The officers conducted an interview after informing Mathiason that they suspected him of committing a burglary, and that the truthfulness of any statement that he made would be evaluated by the district attorney or a judge. In addition, the officer falsely informed Mathiason that his fingerprints were found at the scene of the crime. Mathiason then admitted to his participation in the burglary. At that point, the officer advised Mathiason of his *Miranda* rights and took a taped confession, but released him pending the district attorney's decision to bring formal charges. The interview lasted for thirty minutes.

The Supreme Court held that Mathiason had not been in custody, stating that there was "no indication that the questioning took place in a context where [Mathiason's] freedom to depart was restricted in any way." 429 U.S. at 495. The Supreme Court found the following factors significant: Mathiason (1) had come to the station voluntarily, (2) was informed that he was not under arrest, and (3) left the interview without hindrance. *Id.* at 495. According to the *Mathiason* court, "[s]uch a noncustodial situation is not converted to one in which *Miranda*

applies simply because a reviewing court concludes that, even in the absence of any formal arrest

or restraint on freedom of movement, the questioning took place in a 'coercive environment.'"

*Id.*; *accord Beheler*, 463 U.S. at 1121. The Supreme Court has recognized that "[a]ny interview

of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue

of the fact that the police officer is part of a law enforcement system." *Id.*; *accord Beheler*,

*supra*. *See also Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (quoting *United States v.

Caiello*, 420 F.2d 471, 473 (2d Cir. 1969) ("'It was the compulsive [*sic*] aspect of custodial

interrogation, and not the strength or content of the government's suspicions at the time the

questioning was conducted, which led the [Supreme] [C]ourt to impose the *Miranda*

requirements with regard to custodial questioning.'")).

 In *Beheler*, respondent and several acquaintances had attempted to steal some hashish

from a woman who was selling the drug in the parking lot of a liquor store. This woman was

killed by Beheler's companion and step-brother when she refused to relinquish her hashish.

Shortly thereafter, Beheler called the police, who arrived almost immediately. He told the police

that his brother-in-law had killed the victim, and that other companions had hidden the gun in his

backyard. Beheler gave consent to search the yard and the gun was found. Later that evening,

Beheler voluntarily agreed to accompany police to the station house, although the police

specifically told Beheler that he was not under arrest. At the station house, Beheler agreed to talk

to police about the murder, although the police did not advise Beheler of his *Miranda* rights. As

in *Mathiason*, the interview lasted less than thirty minutes. After being told that his statement

would be evaluated by the district attorney, Beheler was permitted to return to his home. Five

days later, Beheler was arrested in connection with the murder. His statements to the police were

held to be the result of non-custodial questioning, and admissible despite the police's failure to issue *Miranda* warnings.

As in *Mathiason*, Williams's probation officer facilitated a meeting with the police, and Williams voluntarily accompanied the officers to the police department. Unlike the accused in *Mathiason*, however, Williams initially was not told that he was suspected in the murder of Holmes. The initial questioning did not have a compulsory tenor to it; most of the topics discussed (*e.g.*, the origin of Williams's nickname and details about his family life) were unrelated to the murder investigation. Williams eventually was told that the police were investigating the Holmes murder, and that his name had come up in the course of the investigation. H.35. When Williams said that he had heard about it but equivocated as to whether he was there, the police told him that they believed that he was in the vicinity because some people had mentioned his name. H.35-36. The police did not inform Williams that he was a suspect. In any event, as *Mathiason* and other cases illustrate, the fact that an individual is told that he is suspected in connection with a crime does not render a situation "custodial" for purposes of *Miranda*.

At no time during the interview was Williams handcuffed or otherwise restrained, and the door remained unlocked. One officer, Sergeant Gropp, testified that up until the point that Williams said, "You got me, maybe I did have the wrong [date]," he would have allowed Williams to leave had Williams wanted to. H.39. Gropp conceded that after that point, he would have advised Williams of his rights (which in fact was done almost immediately after Williams made the equivocal statements about being at the crime scene). H.39. However, whether or not the officers would have let him go if he had asked is not relevant to the analysis. *See Berkemer v.*

*McCarty*, 468 U.S. 420, 442 (1984) (fact that the police officer apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense was not relevant where the officer never communicated his intention to respondent; "A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

This Court has reviewed the hearing transcript, and agrees with the factual findings made by the suppression court. Furthermore, the state courts' legal conclusion that Williams was not in custody is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See, e.g.*, *Mathiason*, *supra*; *Beheler*, *supra*. Moreover, the Supreme Court has expressly rejected the proposition that once an incriminating statement has been made, no subsequent confession can be truly voluntary. *Oregon v. Elstad*, 470 U.S. 298, 311-314 (1985). The Court notes, as an aside, that Williams's statement to the effect of "You got me," did not implicate him in the crime. Read in context, it referred to his being told that he was mistaken about the day of the week on which the murder occurred. Thus, on its face, the statement arguably was not incriminating. In any event, when a defendant has made a statement without having been given *Miranda* warnings, and *Miranda* warnings are then administered, "the admissibility of any subsequent statement would turn . . . solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309. Williams has not argued that his written, signed statement to police was anything but knowing and voluntary. Habeas relief will not issue on this claim.

**3.     Erroneous introduction of evidence**

Williams contends that the trial court improperly refused to redact the portions of his statement to the police in which he stated that he had sex with Carol Glenn and two other women within hours after the murder. At trial, defense counsel argued that this evidence was "irrelevant" and without probative value, and that was prejudicial in that it "paint[ed] [his] client as a bad person." T.11. The prosecutor responded that the evidence in fact was relevant because it helped to explain why Glenn denied any knowledge of the shooting for two months before she finally changed her story. The prosecutor further argued that petitioner's sexual encounters were relevant to the timing of events. T.22-24. The trial court rejected defense counsel's application. T.26. Glenn was not questioned about the sexual encounter she had with Williams, and she did not testify about it. Rather, it only was introduced into evidence as part of Williams's statement, which was read to the jury. T.523-24. On direct appeal, appellate counsel additionally argued that the unredacted portion of Williams's statement bolstered Glenn's testimony. The state court summarily rejected Williams's claim.

Federal habeas corpus relief will not lie to rectify errors of state constitutional, statutory, or procedural law unless a federal constitutional issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States;" it is not the province of a federal habeas court to re-examine state court determinations of state law.). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998), *cert. denied*, 525 U.S. 840 (1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The task for the habeas court is to

determine "whether the erroneously admitted evidence, viewed objectively in light of the entire record . . . was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *accord, e.g., Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992).

Even if it was error to admit the reference to Williams's sexual encounter with Glenn, which this Court does not find to be the case, the error was harmless under any standard and due process was not violated as a result. Simply stated, the evidence that Williams had sexual relations with Glenn on the night of the incident was not material under any view of the evidence in the case. Thus, habeas relief will not issue on this claim.

**4.    Failure to charge lesser included offenses**

Williams argues that the trial court erroneously denied his request for a jury instruction on the lesser included offenses of first and second manslaughter and criminally negligent homicide. On direct appeal, the Appellate Division reject this contention, noting that there was "no reasonable view of the evidence to support defendant's contention that the jury could have found that he did not intend to cause the victim's death" where the proof at trial was that "defendant and others were hired to kill the victim and the victim was killed in an execution-style shooting[.]" *People v. Williams*, 283 A.D.2d at 999 (citations omitted).

This claim is not cognizable on federal habeas review because it does not implicate a federal constitutional right. *See Estelle v. McGuire*, 502 U.S. at 71-72. Neither the Supreme Court nor the Second Circuit has held that a trial court's failure to instruct a jury on lesser included offenses in a non-capital case is a constitutional issue that may be considered in a habeas petition. *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir. 1995); *accord Jones v. Hoffman*,

86 F.3d 46, 48 (2d Cir. 1996) (*per curiam*).  Thus, Williams is not entitled to habeas relief on this claim.

**5.      Ineffective assistance of trial counsel**

Williams contends that trial counsel provided ineffective representation because (1) he failed to raise a "*Brathwaite*[4] defense based on [the fact that] petitioner's counsel knew that the photograp [*sic*] shown to witness was tainted with the petitioner's name on the photograph" and (2) he failed to request a *Rodriguez* hearing. Amended Petition at A2 (Docket #16).

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

---

[4] *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (holding that a determination regarding the reliability, *i.e.*, correctness, of an identification procedure turns on whether the process was impermissibly suggestive and therefore created a substantial likelihood of irreparable misidentification).

Contrary to Williams's contention, trial counsel did argue in his letter to the suppression court that petitioner's name was on one of the photographs in the array. However, this argument was rejected by the suppression court, which found that all three of the witnesses' identification were confirmatory.

With respect to the failure to request a *Rodriguez* hearing, Williams cannot show either that trial counsel acted unreasonably or that he was prejudiced by the alleged omission. A defendant who seeks to suppress an identification on the ground that it was obtained through impermissible police procedures is presumptively entitled to a *Wade* hearing to "determine whether any police suggestiveness tainted the identification procedure." *People v. Dixon*, 85 N.Y.2d 218, 225, 623 N.Y.S.2d 813 (1995). The trial court may dispense with a full *Wade* hearing, however, where the prosecution alleges that the identifying witness and the defendant are known to each other, "because that witness will naturally be 'impervious to police suggestion,' and the risk of misidentification is therefore slight." *Dixon*, 85 N.Y.2d at 224 (quoting *People v. Rodriguez*, 79 N.Y.2d at 455). In that case, the suppression court then may simply require the prosecution, at a so-called *Rodriguez* hearing, to provide evidence of the extent of the relationship between the witness and defendant. *See People v. Quinones*, 5 A.D.3d 1093, 773 N.Y.S.2d 671, 671 (4th Dept. 2004) ("The purpose of a *Rodriguez* hearing is to establish that an identification is confirmatory when the court denies a request for a *Wade* hearing on that basis.").

By successfully moving for a *Wade* hearing even though the prosecutor alleged that the three identifying witnesses already knew Williams, defense counsel forced the prosecution to produce evidence beyond that which it would have had to disclose at a *Rodriguez* hearing, which

is more limited in scope than a *Wade* hearing. *See*, *e.g.*, *People v. Espinal*, 262 A.D.2d 245, 693

N.Y.S.2d 534, 535 (1st Dept. 1999) ("The prosecution had no obligation to call the identifying

witness [at a *Rodriguez* hearing] and properly established [the witness's familiarity with

defendant] through the testimony of a police detective. . . ."). Thus, defense counsel's demand

for a *Wade* hearing clearly was not ineffective, and in fact was more protective of petitioner's

rights. Under these facts, Williams suffered no prejudice whatsoever. Habeas relief is not

warranted on this claim.

**6.      Prosecutorial misconduct**

Respondent contends that Williams's prosecutorial misconduct claim is unexhausted

because he failed to raise the claim before the highest state court. *See* Docket #19-1 at 13. "The

exhaustion requirement imposed by 28 U.S.C. § 2254(b)(1) means generally that before seeking

a writ of habeas corpus in federal court, a state prisoner must first have presented his claim to the

highest court of the state." *Morgan v. Bennett*, (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117,

119 (2d Cir. 1991); *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) (*per curiam*)). In order to

exhaust his claim before the Court of Appeals, New York state's highest court, a defendant must

give that court a fair opportunity to pass on his federal claim. *Id.* at  369 (2d Cir. 2000) (citing

*Picard v. Connor*, 404 U.S. 270, 275 (1971); *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)

(*per curiam*); *Grey v. Hoke*, 933 F.2d at 119; *Daye v. Attorney General*, 696 F.2d 186, 190-92

(2d Cir. 1982) (*en banc*)).

In *Grey v. Hoke*, the Second Circuit considered the case of a petitioner who had sent the

Court of Appeals a letter requesting leave to appeal; his letter mentioned only one claim, and it

attached his Appellate Division brief which had argued that claim along with two others. The

Second Circuit held that petitioner's submission was insufficient to inform the Court of Appeals that leave was being sought with respect to claims *other than* the sole claim mentioned in the letter. *Grey*, 933 F.2d at 120 ("The fair import of petitioner's submission to the Court of Appeals . . . was that the other two [claims] had been abandoned. The only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims. We decline to presume that the New York Court of Appeals has 'a duty to look for a needle in a paper haystack.'") (quoting *Mele v. Fitchburg District Court*, 850 F.2d 817, 822 (1st Cir. 1988)).

Here, in her letter to the New York Court of Appeals on behalf of Williams, appellate counsel stated that she was enclosing the briefs submitted to the Appellate Division, and then went on to argue in detail two claims stemming from Williams's interrogation by the police following his meeting with his probation officer. *See* App. F at 126 ("It is first urged that leave to appeal be granted in this case . . . to consider . . . whether a defendant was subjected to custodial interrogation . . . ."); App. F. at 127 ("There is a second related issue presented in this case upon which . . . leave to appeal should be granted. . . ."). In the last paragraph of the letter, appellate counsel stated that "pursuant to *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999)," leave to appeal was requested with respect to "the following issues particularly: 1. The defendant was deprived of a fair trial based upon the trial court's erroneous evidentiary rulings. 2. The jury should have been charged on the lesser included offenses because the trial evidence raised the question of intent." App. F at 128. Appellate counsel made no mention of the prosecutorial misconduct claim in the leave application and specifically focused the Court of Appeal's attention on other issues. Thus, it seems to this Court that *Grey v. Hoke* is directly on point and dictates the resolution of

this issue–that the leave application did not fairly apprise the Court of Appeals of the prosecutorial misconduct claim, and indeed conveyed the impression that counsel did not intend to pursue that claim.

Despite Williams's failure to raise the prosecutorial misconduct claim in his application for leave to appeal to the New York Court of Appeals, the Court agrees with respondent that the claim should be deemed exhausted, because it is now procedurally barred from presentation to New York's highest court. "For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey*, 933 F.2d at 120 (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989)). In that situation, a habeas petitioner no longer has "remedies available in the courts of the State" within the meaning of 28 U.S.C. § 2254(b). *Id.*

Here, New York's procedural rules clearly preclude Williams from attempting to raise his prosecutorial misconduct claim before the New York Court of Appeals. First, he cannot again seek leave to appeal these claims in the Court of Appeals because he has already made the one direct appeal to which he is entitled. *See* N.Y. Court Rules § 500.10(a); *accord Grey*, *supra*; *St. Helen v. Senkowski*, 374 F.3d 181, 183-84 (2d Cir. 2004) (*per curiam*), *cert. denied*, 543 U.S. 1058 (2005). Second, collateral review of these claims is barred because the issues were previously raised and determined on direct appeal. *See* N.Y. Crim. Proc. Law §§ 440.10(2)(a); 440.10(2)(c) (barring review if a claim could have been raised on direct review); *accord Grey*, *supra*; *St. Helen*, *supra*. Thus, it would be futile for Williams to return to state court to attempt to exhaust this claim.

As respondent correctly argues, Williams's default in state court of his prosecutorial

misconduct claim precludes him from litigating the merits of that claim in the instant federal habeas proceeding, unless he can demonstrate cause for the procedural default and prejudice resulting therefrom. *Id.* (citing *Murray v. Carrier*, 477 U.S. at 492; *Wainwright v. Sykes*, 433 U.S. at 87-91). Williams has not made the requisite showing of cause or prejudice, and indeed, neither of these prerequisites are discernable on the record before the Court. Furthermore, he has not made a showing of "actual innocence" so as to warrant the fundamental-miscarriage-of-justice exception. *See id.* Thus, the prosecutorial misconduct claim must be dismissed without reaching the merits.

### CONCLUSION

For the reasons stated above, Terrell Williams's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Williams has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        May 23, 2006
             Buffalo, New York.